**SO ORDERED.**

**SIGNED March 31, 2025.**



_____
**JOHN W. KOLWE**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| In re:<br>Linder Oil Company, A Partnership,<br>          *Debtor* | Case No. 17-51323 |
| Lucy G. Sikes, Chapter 7 Trustee and<br>the Cadle Company, II, Inc.,<br>      *Plaintiffs*<br><br>v.<br><br>Crescent Bank & Trust; Consolidated<br>Reserves Company, L.C.; Roger D.<br>Linder; G. Miles Biggs, Jr.; Louisiana<br>General Oil Company; and Linder<br>Energy Company<br>      *Defendants* | Chapter 7<br><br>Judge John W. Kolwe<br><br>Adv. Proc. No. 19-5105 |

### RULING ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This is an action to recover alleged fraudulent conveyances brought by Lucy G. Sikes, the Chapter 7 Trustee ("Trustee") in the Linder Oil Company, A Partnership ("LOCAP" or "Debtor") bankruptcy case, and The Cadle Company II, Inc. ("Cadle"), the successor to LOCAP's primary lender, First NBC Bank. (Cadle is also an assignee of certain claims from the LOCAP bankruptcy estate and a party to a litigation

support agreement with the Trustee.) The Complaint as amended asserts claims under §§ 544(b), 548, and 550 of the Bankruptcy Code against defendants Consolidated Reserves Company, L.C. ("Consolidated"), Roger D. Linder ("Roger Linder"), G. Miles Biggs ("Biggs"), Louisiana General Oil Company ("Louisiana General"), Linder Energy Company ("Linder Energy;"), and Crescent Bank ("Crescent"). Before the Court are Motions for Partial Summary Judgment filed by each party. These matters were taken under advisement following oral argument, subsequent briefing by the parties, and a final hearing. The Court has considered the parties' pleadings, oral arguments, and the summary judgment record, and rules as follows.

## BACKGROUND

### A.    Overview of the Debtor's Business and Relationship of the Parties[1]

Prior to bankruptcy the Debtor was a general partnership owned by defendants Linder Energy and Louisiana General. Linder Energy is a corporation owned by Roger Linder, and Louisiana General is a corporation owned by Biggs. The Debtor's business purpose was to operate oil and gas properties owned by companies that were also owned and controlled by Roger Linder and Biggs, namely, Consolidated, Reserves Management, L.C. ("Reserves") and Destin Resources, LLC ("Destin").[2] The services the Debtor provided included "general administration services together with field operating and property development services" for a monthly fee.[3] The Debtor and each defendant, except Crescent, are affiliated through ownership, but "each is

---

[1] Unless otherwise noted, the undisputed facts set out in this section come from the Plaintiff's Statement of Contested Facts Relative to Crescent's Motion for Partial Summary Judgment, ¶¶ B-E (ECF #453); and/or Crescent's Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment, ¶¶ 1-5 (ECF #426-2).

[2] *Id.* Consolidated is owned by Roger Linder and Biggs. Reserves was owned by Roger Linder and Biggs and Roger Linder was the majority owner of Destin (Roger Linder's son-in-law owns a minority interest in Destin).

[3] *Id.*; s*ee also* Company Profile: Consolidated Reserves Company, L.C., Reserves Management, L.C. Destin Resources, LLC and Linder Oil Company, A Partnership and Its Partners Linder Energy Company/Louisiana General Oil Company ("Company Profile"), pp. 14-19 (ECF # 434), *citing to* p. 16. Additionally, *see* Transcript of 30(b)(6) Deposition of Louisiana General Oil Co., pp. 16-27 (ECF #434-2).

2

maintained and strictly operated as separate business entities having separate and distinct organization and business plans."[4]

Operations on the various oil and gas properties owned by Consolidated, Destin, and Reserves were financed by bank loans made directly to those entities by Crescent and First NBC. Beginning in 2006 through at least 2010, Crescent made certain loans to Consolidated and/or a wholly owned affiliate of Consolidated, CRCOne, LLC (referred to collectively as "Consolidated").[5] These loans were later combined into one loan (the "Crescent Loan") that was guaranteed by Roger Linder and Biggs.[6] Additionally, Roger Linder granted a mortgage and security interest covering his home and other interests to Crescent.

Crescent claims that Consolidated owned certain oil and gas interests at the time it made the loans, but those interests were assigned by Consolidated to Destin and Reserves.[7] It is undisputed, however, that LOCAP was not a party to or guarantor of the Crescent Loan. It is also undisputed that Crescent did not have a security interest in any of LOCAP's assets or in any of the oil and gas properties owned by Consolidated, Destin, or Reserves. The Crescent Loan was outstanding during all time periods at issue in this litigation.[8]

First NBC made a series of loans to Destin and Reserves beginning in 2009. These loans were secured by mortgages and security interests in oil and gas properties owned by Destin and Reserves. The Debtor, LOCAP, as well as Louisiana General, Linder Energy, and Roger Linder also executed guaranty agreements in favor of First NBC.

---

[4] Company Profile, p. 17 (ECF #434).

[5] CRCOne, LLC is a Delaware limited liability company that was formed in 2004 by Consolidated and FC Energy Finance I, Inc. ("FC"), a subsidiary of Banc One Capital Corporation (now JPMorgan Chase Co.) to own certain proved producing properties in and offshore Louisiana. FC later sold a portion of its interest to Northwestern Mutual Life Insurance Company. In August 2010, Consolidated acquired the interests of JP Morgan Chase and The Northwestern Mutual Life Insurance Company and from that point has been the sole owner of CRCOne. *See* Plaintiff's Statement Material Facts Not in Dispute, ¶ 5 (ECF #410), and Company Profile, p. 15 (ECF #434).

[6] *See* Crescent's Statement of Material Facts in Support of Motion for Partial Summary Judgment, ¶ 9 (ECF #425-2).

[7] *Id*. at ¶ 8.

[8] *See* Plaintiff's Statement Material Facts Not in Dispute, ¶¶ 27, 119-25 (ECF #410).

In April 2017, First NBC was closed by the Louisiana Office of Financial Institutions, and the FDIC was named the bank's receiver. In September 2017, Cadle purchased the First NBC loans from the FDIC. The total indebtedness owed to First NBC/Cadle on the loans exceeds $100 million.[9]

Soon after First NBC's closure and Cadle's commencement of collection efforts, LOCAP, Destin and Reserves also met their demise. LOCAP filed its chapter 7 case in this court on October 10, 2017, followed soon after by Reserves on December 4, 2017 (Case No. 17-51570), and Destin on December 18, 2017 (Case No. 17-51634). The Reserves and Destin bankruptcies were also chapter 7 proceedings that were filed in this court.

LOCAP's Trustee entered into a series of agreements with Cadle, including a litigation support agreement, that provides for a sharing of proceeds which may be recovered in the litigation by the Trustee, net of litigation costs. The Trustee also assigned certain claims to Cadle. The Trustee and Cadle commenced this action on October 10, 2019.

## B.    The Trustee's Claims

The focus of this action is on the recovery of what the Trustee alleges were fraudulent cash transfers totaling $7,172,074.77. These transfers can be separated into two categories: transfers to Consolidated, with subsequent transfers to Crescent (the "Consolidated Transfers"); and partner distributions to Linder Energy and Louisiana General, with subsequent transfers to Roger Linder and Biggs (the "Partner Distributions"). These transfers occurred generally on a monthly basis, and the total represents all monthly transfers running from August 1, 2010, to the date of LOCAP's bankruptcy, October 10, 2017.[10]

---

[9] Cadle filed a number of Proofs of Claim in the main bankruptcy case: Claim Nos. 33, 34, 35, 36, 38, 39, 40, 42, 43, 44, 45, and 46.

[10] The August 1, 2010, date corresponds to a prior ruling by this Court concerning the application of a 2013 legislative change to Louisiana law concerning the prescriptive period on revocatory actions. Prescription on the Trustee's revocatory action will be discussed in Section A.4 of the "Law and Analysis" section of this Opinion, entitled "Prescription on the Revocatory Action."

4

### 1. The Consolidated Transfers and grounds for recovery

As to the Consolidated Transfers, the Trustee states that the Debtor was an oil and gas operator that held proceeds from the sale of production from wells owned by Destin and Reserves.[11] The Trustee generally claims that over the period at issue in this lawsuit, the Debtor transferred portions of these production revenues to Consolidated, instead of using those proceeds to pay the Debtor's creditors, with the balance being paid over to Destin and Reserves, as the owners of the mineral interests. The Trustee further claims that the Debtor disguised these payments as loans in its financial records for which it received nothing of value in return from Consolidated.[12]

As the reason for these transfers, the Trustee asserts that Roger Linder and Biggs, who effectively controlled the Debtor and related entities, had personally guaranteed Crescent's loan to Consolidated, and Roger Linder had also granted Consolidated a mortgage over his home and other personal property to secure the Consolidated loan, thus giving both of them an incentive to divert the funds from the Debtor to Consolidated. Additionally, the Trustee claims Roger Linder had a close friendship with Fred Morgan, "Crescent's president, founding shareholder, and the loan officer in charge of all non-automobile loans (including the loan to Consolidated)," which he had an incentive to preserve.[13] In essence, the Trustee alleges in her lawsuit and argues here that the Debtor was not legally obligated to repay Consolidated's loan to Crescent, and Crescent knew that Consolidated could not afford to make payments on its own; nevertheless, Roger Linder and Biggs wrongfully caused the Debtor to transfer funds to Consolidated to repay the Crescent loan to the detriment of the Debtor and its creditors.

The Trustee has asserted three grounds for avoiding these transfers: the Louisiana revocatory action as authorized under § 544(b) of the Bankruptcy Code (Count 1), actual fraud under 11 U.S.C. § 548(a)(1)(A) (Count 2), and constructive

---

[11] First Amended Complaint, ¶11 (ECF # 74).
[12] *See id*. at ¶¶ 11-12, 17-54.
[13] *Id*., ¶ 30.

fraud under 11 U.S.C. § 548 (a)(1)(B) (Count 3). The Trustee seeks to recover the Consolidated Transfers from the initial and subsequent transferees, including Crescent, as allowed by 11 U.S.C. § 550 (Count 4).

The Plaintiffs' Statement of Material Facts Not in Dispute and the voluminous bank records attached to it set forth the transfers that were made by the Debtor to Consolidated and from Consolidated to Crescent running from August 1, 2010, to October 10, 2017. With respect to the claims under 11 U.S.C. § 548(a) (Counts 2 and 3), which has a look-back period dating back two years from October 10, 2017, the summary judgment record shows that LOCAP made monthly payments to Consolidated totaling $612,800. These transfers were made from either LOCAP's Chase Bank Account or its First NBC Bank Account to Consolidated's Chase Bank Account.[14] During this same period, Consolidated made monthly transfers to Crescent totaling $608,385.41.[15] The transfers from Consolidated to Crescent occurred on the same day that Consolidated received the transfer from LOCAP, with the exception of the transfers in December 2016 and January 2017, in which the transfers to Crescent occurred one day and three days, respectively, from the date LOCAP made the transfer to Consolidated.[16]

The look-back period for the Trustee's claims under § 544(b) (Count 1), which incorporates the applicable look-back period for revocatory actions under Louisiana law, is at least three years, and under the circumstances of this case, may go back to August 1, 2010. Thus, in addition to the transfers during the two year period, the Trustee has identified, for the period from October 10, 2015 back to August 2010, monthly transfers from LOCAP to Consolidated totaling $2,970,274.77.[17] During this same period, Consolidated made monthly transfers to Crescent totaling $2,486,375.94.[18]

---

[14] Plaintiff's Statement of Material Facts Not in Dispute, ¶ 40 (ECF #410).
[15] *Id.*
[16] *Id.*
[17] Plaintiff's Statement of Material Facts Not in Dispute, ¶¶ 42-42 (ECF #410).
[18] *Id.*

6

Crescent admits that it received each of the transfers outlined by the Trustee. However, all the defendants dispute the transfers from LOCAP to Consolidated on the grounds that "Plaintiffs have failed to attach sufficient evidence of the" transfers.[19] The Court has reviewed the bank records submitted by the Trustee in support of the transfers and finds that they specifically identify the accounts from which the funds were transferred and the accounts into which the funds were transferred. The defendants have not offered any evidence showing that these accounts were not owned by LOCAP and/or Consolidated. Thus, the Court finds that the summary judgment record establishes each of the transfers made by LOCAP to Consolidated, and that it further establishes the subsequent transfers to Crescent.

## 2.    The Partner Distributions and grounds for recovery

The second category of transfers at issue in the First Amended Complaint are the Partner Distributions from LOCAP to Linder Energy and Louisiana General, with subsequent transfers to Roger Linder and Biggs.[20] The First Amended Complaint identifies only two transfers as Partner Distributions: $4,374,000 in 2009 and $4,568,500 in 2010.[21] However, the Trustee "reserve[d] the right to supplement this claim through discovery."[22] She claims the Partner Distributions were made with the actual intent to defraud creditors because they were made at a time when the Debtor's creditors were not being paid.

The summary judgment record shows that the total distributions made to LOCAP's partners are much less than the amounts alleged in the Amended Complaint. The record shows that for the period dating from calendar year 2010 up to the date of LOCAP's bankruptcy in 2017 the Debtor made distributions to Linder Energy (Roger Linder) totaling $2,940,000.[23] During the same period, $646,500 was

---

[19] *See* Crescent's Response to Plaintiff's Statement of Material Facts Not in Dispute, ¶¶ R, S, and T (ECF #455-1). Note that the Non-Bank Defendants adopted these statements. *See* Non-Bank Defendants' Response to Statement of Material Facts Not in Dispute, ¶¶ 40-42 (ECF #446-1).
[20] *See* First Amended Complaint, ¶ 55.
[21] *Id*.
[22] *Id*, ¶ 100.
[23] Plaintiff's Statement of Material Facts not in Dispute, ¶¶ 52-62 (ECF # 410).

7

distributed to Louisiana General (Biggs).[24] The Trustee has asserted two grounds for recovering these transfers: a revocatory action under Louisiana law as allowed by § 544(b) of the Code (Count 5) and a claim for transferee liability under § 550 of the Code (Count 4).

Absent from the Amended Complaint is a claim to recover the Partner Distributions for actual fraud under § 548 of the Code. Nonetheless, the Trustee's Motion for Summary Judgment seeks to recover these transfers under § 548, which the Non-Bank Defendants oppose. The Court will address the Trustee's failure to specifically assert a § 548 claim as to the Partner Distributions below in its analysis of the § 548 issues presented by the motions for partial summary judgment.

## C.    Cadle's Claims

The First Amended Complaint also sets forth two state law grounds for recovery of the Consolidated Transfers and the Partner Distributions by Cadle: a breach of fiduciary duty claim against Roger Linder and Biggs (Count 6) and a suit on open account under La. R.S. 9:2781 against Consolidated (Count 7). These are claims owned the Debtor's estate that were conveyed to Cadle by the Trustee under the terms of the Litigation Support Agreement.[25]

As to Count 6, Cadle alleges Roger Linder and Biggs, as the owners and managers of the Debtor, owed the Debtor fiduciary duties, including duties of loyalty, good faith, candor, due care, full disclosure and a duty to refrain from self-dealing. Cadle claims these duties were breached by Roger Linder and Biggs when they caused the Debtor to make the Consolidated Transfers and Partner Distributions without receiving reasonably equivalent value or any value whatsoever.

Finally, Cadle claims the transfers by the Debtor to Consolidated were accounted for on the Debtor's books as advances or loans that may be recovered under Louisiana's open account statute (Count 7).

---

[24] *Id.*, ¶¶ 63-73.
[25] *See* Amended Litigation Agreement (ECF #569), attached to the Court's October 9, 2019 Amended Order Approving Motion for Entry of Order Authorizing Trustee to Employ Special Counsel.

**D.      The Parties' Motions for Partial Summary Judgment**

The parties have completed discovery and have indicated that the case is ready for trial. To possibly pare down the triable issues, each party has moved for partial summary judgment on certain elements of, or defenses to, each of the Counts set forth in the First Amended Complaint, with the exception of Count 6, which is not addressed by any of the parties. The Court will summarize each party's basis for summary judgment in the "Law and Analysis" section of this opinion. For the reasons that follow, the Court will deny each party's motion, with the exception of the Non-Bank Defendants, which the Court recommends be granted as to their argument that Count 7 should be dismissed, but otherwise denied.

## JURISDICTION

Before turning to the merits of the motions, the Court will examine its jurisdiction over this matter. The defendants contend the bankruptcy court does not have the constitutional authority to enter a final judgment on the parties' motions for summary judgment. First, they assert that this court lacks the authority to enter final orders and judgments, citing *Stern v. Marshall*,[26] because, according to them, Cadle, not the Trustee, is the real party in interest. Second, some of the defendants claim that because they did not submit a proof of claim in LOCAP's bankruptcy case, they have a right to a jury trial on all claims.[27] The Court will examine each of these assertions.

**A.      Overview of Bankruptcy Court Jurisdiction**

Bankruptcy jurisdiction "is grounded in, and limited by, statute."[28] Federal district courts "have original jurisdiction but not exclusive jurisdiction of all civil

---

[26] 564 U.S. 462, 131 S. Ct. 2594 (2011) (holding that even though 28 U.S.C. § 157(b)(2)(C) designated common law counterclaims to proofs of claims as falling within a bankruptcy court's core jurisdiction, it is nonetheless unconstitutional to the extent that it authorizes non-Article III bankruptcy judges to enter final orders and judgments on such counterclaims).

[27] *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 36, 109 S. Ct. 2782 (1989) (holding that the Seventh Amendment of the United States Constitution entitles a person *who has not submitted a claim against a bankruptcy estate* to a trial by jury on a fraudulent conveyance claim, notwithstanding Congress' designation of fraudulent conveyance actions as "core proceedings" in 28 U.S.C. § 157(b)(2)(H)).

[28] *Celotex Corp. v. Edwards,* 514 U.S. 300, 307 (1995); *In re Wilborn,* 609 F.3d 748 (5th Cir. 2010).

proceedings arising under title 11, or arising in or related to cases under title 11."[29] There are thus three types of bankruptcy jurisdiction: "arising under," "arising in," and "related to" jurisdiction. "Arising under" jurisdiction encompasses claims created by Title 11, such as an avoidance claim under 11 U.S.C. § 544(b).[30] "Arising in" jurisdiction pertains to matters that could only arise in a case under Title 11.[31] "Related to" jurisdiction exists when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."[32] The district court is authorized under 28 U.S.C. § 157(a) to refer "any and all proceedings arising under title 11 or arising in or related to a case under title 11" to the bankruptcy judges within the district.

"Arising under," "arising in," and "related to" bankruptcy jurisdiction is further classified into "core" and "noncore" jurisdiction under the statutory framework established by 28 U.S.C. § 1334 and 28 U.S.C. § 157. Proceedings that arise under or arise in title 11 are defined as "core" matters and those that are only related to a title 11 case are defined as noncore matters.[33] Bankruptcy courts may statutorily enter final judgments in "core" proceedings, while in "noncore" matters bankruptcy courts may only submit proposed findings of fact and conclusions of law to the district court for that court's review and issuance of a final judgment.[34]

> But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the *statutory* power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; *but also (b) whether the*

---

[29] 28 U.S.C. § 1334(b).

[30] *See, e.g., Carlton v. BAWW, Inc.,* 751 F.2d 781 (5th Cir. 1985).

[31] *Wilborn,* 609 F.3d at 752.

[32] *In re Wood,* 825 F.2d 90, 93 (5th Cir. 1987) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984)).

[33] *See Stern,* 564 U.S. at 473-474. Core proceedings include but are not limited to 16 different types of matters, including "counterclaims by [a debtor's estate] against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).

[34] *See* 28 U.S.C. § 157(c)(1).

10

> conferring of that authority on an Article I bankruptcy court
> is constitutional (and this turns on whether "the action at
> issue stems from the bankruptcy itself or would necessarily
> be resolved in the claims allowance process").[35]

Thus, even if a claim meets the definition of "core," this Court is only constitutionally authorized to render final judgment on the matter if the claim derives from the bankruptcy case or relates to the claims allowance process. If a claim is a *Stern* claim, the bankruptcy court must submit proposed findings of fact and conclusions of law to the district court. Finally, parties may consent to the bankruptcy court's adjudication of noncore matters, including *Stern* claims, without implicating Article III issues "when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge."[36]

## B.     The *Stern* analysis

Turning to this case, the determination of this court's jurisdiction and authority to enter final orders rests on the nature of the claims asserted in this proceeding. The claims asserted in Counts 1 through 5 are within the jurisdictional grant of 28 U.S.C. § 1334(b). Those Counts set forth fraudulent transfer and avoidance claims under 11 U.S.C. §§ 544, 548 and 550 by the Trustee. These claims are created by the Bankruptcy Code, and thus fall within the court's "arising under" jurisdiction. This also makes them "core" claims.[37] Moreover, since the claims are a product of the Bankruptcy Code, they necessarily stem from LOCAP's bankruptcy. Thus, the bankruptcy court appears to have the authority to render final judgments and orders in this matter under the reasoning of *Stern*.

Crescent disagrees, arguing that Cadle, as the partial assignee of certain claims by the Trustee, is the true party in interest—even in the claims asserted by the Trustee. With little explanation Crescent claims the agreement between the

---

[35] *Highland Capital Management L.P. v. Highland Capital Management Services, Inc. (In re Highland Capital Management L.P.)*, 2021 WL 7541482 *3 (Bankr. N.D. Tex. 2021), quoting *Stern*, 564 U.S. at 499 (emphasis added).

[36] *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1939 (2015).

[37] *See* 28 U.S.C. § 157(b)(2)(H) ("Core proceedings include, but are not limited to— …(H) proceedings to determine, avoid, or recover fraudulent conveyances.").

11

Trustee and Cadle makes the Trustee's claims *Stern* claims and asserts that this Court lacks jurisdiction to enter final orders without the consent of all parties, which Crescent does not give. Thus, Crescent contends this Court should issue its opinion on the various motions for summary judgment as a report and recommendation to the District Court.

The Court rejects Crescent's assertion. The claims in Counts 1 through 5 arise under the Bankruptcy Code, the Trustee has an ownership interest in those claims, and, under the court approved litigation agreement, she has the authority to direct the litigation. Thus, under both the governing statutes and *Stern*, this Court has the authority to enter final orders and judgments on Counts 1 through 5.

Counts 6 and 7 are different. They set forth estate claims for breach of fiduciary duty and the collection of an open account under Louisiana state law that were assigned to Cadle by the Trustee prior to the filing of the Complaint. These claims do not fall within the court's "arising under" or "arising in" jurisdiction established by 28 U.S.C. § 1334(b), and thus they are not "core" matters under 28 U.S.C. § 157. The question is whether the Court has "related to" jurisdiction over these claims. The parties seem to believe that to be the case, as they have not questioned the Court's jurisdiction over those Counts. Nonetheless, the Court has an independent duty to examine its jurisdiction.

The Court finds "related to" jurisdiction over Counts 6 and 7 to be questionable under the "time-of-filing" rule.[38] This rule, which dates from 1824 and is described by the Fifth Circuit as "hornbook law," provides "that subject matter jurisdiction is determined when a federal court's jurisdiction is first invoked."[39] "Although courts have not often considered the time-of-filing rule for cases related to bankruptcy, it applies to bankruptcy jurisdiction no less than it applies to diversity or federal

---

[38] *See Double Eagle Energy Servs., L.L.C. v. Markwest Utica Emg, L.L.C.*, 936 F.3d 260 (5th Cir. 2019).

[39] *Id.*, at 263, *citing Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570, 124 S. Ct. 1920, 158 L. Ed. 2d 866 (2004); *see also Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539, 6 L. Ed. 154 (1824) ("The jurisdiction of the court depends upon the state of things at the time of the action brought.").

question jurisdiction."[40] At the time this adversary proceeding was filed, the Trustee had already assigned the claims in Counts 6 and 7 to Cadle. Since these are state law claims between third parties, "related to" jurisdiction under § 1344(b) appears to have been lacking on these Counts at the time this case was filed.[41]

There is an additional factor to consider, however. Under the terms of the agreement between the Trustee and Cadle, the Debtor's bankruptcy estate retained a right to share in Cadle's recovery, if any, on the former estate claims asserted in Counts 6 and 7. Perhaps this is sufficient to trigger "related to" jurisdiction because the outcome may impact the distribution to creditors.[42] Put another way, there is a sufficient nexus between the claims in Counts 6 and 7 and the bankruptcy estate such that it is conceivable that the outcome on those claims could have an effect upon the bankruptcy estate because it has the potential to increase distributions to unsecured creditors.

These claims, however, are subject to the procedure for litigating non-core "related to" matters under § 157. Section 157(c)(1) provides that a bankruptcy judge "may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11," and that "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."

The Non-Bank Defendants have moved for summary judgment on Count 7. Accordingly, the Court's decision on that claim represents this Court's proposed

---

[40] *Id.*

[41] Ironically, the court's holding in *Double Eagle* indicates that had the Trustee filed suit asserting the claims in Counts 6 and 7 and then later assigned the claims to Cadle, this Court may have retained the "related to" jurisdiction that clearly existed at the time the Trustee asserted the claims. This is because "the related-to-bankruptcy jurisdiction that existed at the outset of this case never went away." *Id.* at 264.

[42] *See* COLLIER ON BANKRUPTCY, ¶ 3.01[e][v] ("Put another way, litigation that would not have an impact upon . . . *the distribution to creditors*, cannot find a home in the district court based on the court's bankruptcy jurisdiction." (emphasis added)).

13

findings of fact and conclusions of law for the district court's consideration and issuance of a final decision.

## C.     The Defendants' Right to a Jury Trial

Crescent, Consolidated, Linder Energy, and Louisiana General previously moved to withdraw the reference based on their alleged right to a jury trial as defendants who did not submit claims against the bankruptcy estate, and who do not consent to this court conducting a jury trial, assuming the district court would allow it.[43] The district court entered orders denying the motions as premature, explaining: "While the demand for a jury trial is grounds to withdraw the reference, the Court finds that it is premature to withdraw the reference. The Bankruptcy Court is the most qualified court to address pretrial matters and get the matter ready for trial."[44]

Now that discovery has concluded, these Motions for Partial Summary Judgment remain the only significant remaining step prior to trial. Accordingly, this Court's order on the parties' motions for partial summary judgment will include a directive that the defendants in question again move to withdraw the reference on the grounds that the case is ready for a jury trial before the district court.

## SUMMARY JUDGMENT STANDARD

The Motions for Partial Summary Judgment are subject to the usual Fed. R. Civ. P. 56 summary judgment standards, made applicable to adversary proceedings by Fed. R. Bankr. P. 7056. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment is to pierce the pleadings, to assess the proof, and to determine whether there is a genuine need for trial.[45] Summary judgment procedure is designed

---

[43] *See Granfinanciera,* 492 U.S. at 36; *see also* 28 U.S.C. § 157(e) ("If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.").

[44] *See* District Court Orders (ECF ##155 and 156).

[45] *Goodman v. Triple "C" Marine Salvage, Inc. (In re Gulf Fleet Holdings, Inc.),* 485 B.R. 329, 334 (Bankr. W.D. La. 2013), citing *Matsushita Electric Industries v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

14

to isolate and dispose of factually unsupported claims or defenses.[46] If the movant bears the burden of persuasion at trial on a claim or defense addressed in the motion for summary judgment, the movant must establish that there is no genuine dispute of material fact as to those claims or defenses. To satisfy this burden, the movant must come forward with competent summary judgment evidence conclusively establishing that no reasonable trier of fact could find other than for the moving party.[47] To avoid summary judgment, the non-movant must then come forward with evidence showing that there is a genuine dispute of material fact.

## LAW AND ANALYSIS

**A.  Counts 1 and 5: Louisiana Revocatory Action—§ 544(b) and La. Civ. Code art. 2036**

Counts 1 and 5 present claims under the Louisiana revocatory action, as authorized by § 544(b) of the Code. Under 11 U.S.C. § 544(b), a trustee succeeds to the rights of an unsecured creditor to avoid a transaction under non-bankruptcy law. In other words, if an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and "avoid" the debtor's transfer. The Trustee's rights under § 544 arise under federal law, but the scope of the rights are defined by non-bankruptcy law.[48]

The non-bankruptcy law relied upon by the Trustee is the Louisiana revocatory action found in La. Civ. Code art. 2036. It provides that "[a]n obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency."[49] To be successful on a revocatory action, it must be shown that (1) there was an act by the obligor—here the debtor—that occurred after the obligee's—i.e. the

---

[46] *Id.*, citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).
[47] *Id.*, citing *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986).
[48] *See In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 762 (Bankr. W.D. La. 2013) (citations omitted).
[49] La. Civ. Code art. 2036.

creter's—right to payment by the obligor arose, and (2) the act caused or increased the debtor's insolvency.[50]

Equally important in a revocatory action is the prescriptive period. This period is provided in La. Civ. Code art. 2041, which for all time periods at issue in this case, provided a one year prescriptive period from the date the obligee learns of the "act" that may have caused or increased the obligor's insolvency "but never after three years from the date of that act," except "in cases of fraud," in which the three year limitation "shall not apply."[51]

Each party has moved for partial summary judgment on certain elements of the revocatory action and collectively the motions require the Court to determine: (1) whether each Consolidated Transfer and Partner Distribution was an "act of the obligor" as contemplated by Article 2036; (2) whether the Trustee has identified any unsecured creditors that held claims against the Debtor both at the time of each "act of transfer" at issue in this case and on the Debtor's petition date that would "trigger" her right to bring the revocatory action under § 544(b); (3) whether, as a matter of law, the solvency determination required by Article 2036 can be based on the assets of the entire "Linder Group" instead of just the Debtor, individually; and (4) where this is a "case of fraud" that allows for extension of the prescriptive period under La. Civ. Code art. 2041 (2013).

### 1. **"Act of the obligor"**

The Trustee asserts that each Consolidated Transfer and Partner Distribution satisfies the requirement of an "act."[52] The Non-Bank Defendants, who are the only defendants targeted in Counts 1 and 5, generally agree with the Trustee's assertion,

---

[50] *See Gaubert Oil Company v. Bayou Fuel Marine and Hardware Sup., Inc.* 280 So. 3d 1013, 1020-1021 (La. Ct. App. 2019).

[51] *See* La. Civ. Code art. 2041 (2013).

[52] *See* Memorandum in Support of Trustee's Motion, pp. 12-13 (ECF #409). The Trustee relies upon Official Comment (d) to La. Civ. Code art. 2036, which provides, in part: "The term 'act' in this Article encompasses contracts, acts of payment, and any 'contrivance' employed by an obligor to defeat his obligee's rightful claim. . . . According to the jurisprudence, any arrangement, whether made through judicial machinery or otherwise, whereby an obligor tries to give an obligee an advantage over others may be attacked by the injured obligees. . . ."

16

stating: "Non-Bank Defendants do not contest that the alleged transfers would constitute an interest of the Debtor in property, *per se*."[53]

As noted above, the summary judgment record establishes each of the Consolidated Transfers and the Partner Distributions. Accordingly, the Court finds that the Trustee has met the requirement of showing an "act" that may have impoverished the Debtor to the prejudice of its unsecured creditors.

### 2. The "Triggering Creditors"

"Under section 544(b)(1), the trustee succeeds to the rights of an unsecured creditor in existence at the commencement of the case who may avoid the transfer under applicable" non-bankruptcy law.[54] Put another way, a trustee can bring an action under § 544(b) of the Bankruptcy Code only if there is at least one "triggering" unsecured creditor that could have brought an action when the bankruptcy petition was filed.[55] For purposes of the Louisiana revocatory action, it must be shown that the same creditor also had a claim to payment by the Debtor at the time of each act of transfer. Thus, to satisfy both § 544(b) of the Code and La. Civ. Code art. 2036, the Trustee must show that the same creditor holds a claim at the time of each transfer in question and at the time of the debtor's bankruptcy filing.[56]

Here, the Trustee claims there are at least three creditors that satisfy this requirement: B&J, Inc., Offshore Specialty Fabricators, LLC and Wood Group, successor to Grasso Production Management, Inc. (collectively, the "Triggering Creditors"). The Trustee asks the Court to take judicial notice of the proofs of claims filed by B&J and OSF, as well as the Debtor's schedules, which lists each of these Triggering Creditors as unsecured creditors on the Debtor's petition date. Additionally, the summary judgment record includes numerous exhibits submitted by the Trustee that show that each Triggering Creditor had a claim against the

---

[53] Non-Bank Defendants Memorandum in Opposition, pp. 2 & 11 (ECF #446).
[54] 5 COLLIER ON BANKRUPTCY ¶ 544.06[1]-[2] (Richard Levin & Henry J. Sommer eds., 16th ed.).
[55] *U.S. Bank Nat'l Ass'n v. Verizon Communs., Inc.*, 479 B.R. 405, 411 (N.D. Tex. 2012).
[56] *See* 5 COLLIER ON BANKRUPTCY, *supra*, ¶ 544.06.

Debtor at the time of each Consolidated Transfer and Partnership Distribution.[57] The Trustee also goes to great lengths to explain why each Triggering Creditor's claim remains viable. Finally, the Trustee argues that Cadle, as the successor to First NBC, also satisfies the triggering creditor requirement.

In opposition, the Non-Bank Defendants and Crescent do not contest that the Court can take judicial notice of the proofs of claim and schedules regarding the Triggering Creditors. Nor do they offer any evidence refuting the Trustee's assertions that the Triggering Creditors held claims at the time of each transfer at issue in this case and on LOCAP's petition date. Instead, they contend that even if these creditors did have a viable claim at the time of each transfer, all transfers occurring more than three years before LOCAP's bankruptcy filing have prescribed.[58] Moreover, to the extent Cadle is the triggering creditor, they argue the Trustee's claims are subject to a one-year prescriptive period because Cadle's predecessor, First NBC, had knowledge of each of the transfers.

Since §544(b) of the Bankruptcy Code only requires the existence of "*a creditor holding an unsecured claim that is allowable under section 502*," the Court finds that the Trustee has satisfied this requirement irrespective of whether Cadle is a triggering creditor.[59] This is because the summary judgment record shows that each Triggering Creditor held claims against the Debtor both at the time of the Consolidated Transfers and the Partner Distributions and at the time the Debtor

---

[57] *See* Memorandum in Support of Trustee's Motion, pp. 13-17 (ECF #409), and the exhibits identified in those pages. The record shows that the Triggering Creditors held claims at the time of each of the transfers at issue in this case except Wood Group, which did not hold a claim at the time of three of the transfers.

[58] *See* Non-Bank Defendants' Memorandum in Support of Motion for Partial Summary Judgment, pp. 7-16 (ECF #398). *See* Crescent's Memorandum in Support of Motion for Partial Summary Judgment, pp. 16-21 (ECF #420-5).

[59] 11 U.S.C. § 544(b) (emphasis added). The Court previously addressed the issue of whether Cadle was the triggering creditor when it considered an earlier Motion for Judgment on the Pleadings (ECF #347) by the Non-Bank Defendants seeking dismissal of Counts 1 and 5. In that Motion the Defendants argued that the Trustee had not identified any triggering creditors in the Amended Complaint other than Cadle. They argued that Cadle could not be the triggering creditor under § 544(b) because it was a secured creditor at the time the Debtor's bankruptcy case was filed. The Court concluded that Cadle was not the triggering creditor but concluded that the Trustee had nonetheless satisfied the pleading requirements on this issue. *See* the Court's July 30, 2024 Order Denying the Motion for Judgment on the Pleadings (ECF #393), referencing reasons orally assigned by the Court at the hearing.

filed its chapter 7 petition. The Court also finds, based on the summary judgment record, that those claims were viable on LOCAP's bankruptcy petition date. Section 544(b) does not require more than one creditor, and the summary judgment record establishes the existence of at least one creditor. This requirement is met. (The Non-Bank Defendants' prescription argument will be addressed below.)

### 3. "Group Insolvency"

A key requirement of the revocatory action is that the "act" must cause or increase the obligor's insolvency.[60] Thus, the Trustee must prove that each Consolidated Transfer and each Partner Distribution caused or increased the Debtor's—i.e., LOCAP's—insolvency. The parties did not present any summary judgment evidence addressing the Debtor's insolvency at any given point in time, much less on the date of each of the transfers at issue. That failure precludes any definitive resolution of the Trustee's revocatory action at this stage of the proceeding.[61]

However, one of the defendants, Crescent, has moved for summary judgment with respect to the methodology that the Court should employ to determine the Debtor's solvency. Crescent contends, "as a matter of law" that "this court must consider the solvency of all the Linder Oil Group in its analysis of Debtor's solvency under the revocatory action."[62] Crescent's argument appears to stem from the fact that the Non-Bank Defendants guaranteed Crescent's loan to Consolidated and the loan from First NBC. According to Crescent:

> And, **as for Crescent, it considered Linder Oil Group, [Roger] Linder and Biggs as part of the integrated business in relying on the personal guaranties of [Roger] Linder and Biggs.** Therefore, in considering the solvency of the *guarantor* of First NBC's debt, one must

---

[60] La. Civ. Code art. 2036. "An obligor is insolvent when the total of his liabilities exceeds the total of his fairly appraised assets." La. Civ. Code art. 2037.

[61] The summary judgment record shows that the Debtor booked each transfer to Consolidated as a loan. The Court presumes, then, that at trial the Trustee may need to prove this method of accounting for each transfer was a sham in order to show that they caused or increased the Debtor's insolvency.

[62] *See* Crescent's Memorandum in Support of Motion for Partial Summary Judgment, pp. 19-21 (ECF #420-5).

19

> consider the solvency of the primary borrowers: Destin and
> Reserves, as well as the other guarantors: [Roger] Linder,
> Biggs, Louisiana General, and Linder Energy. For that
> reason, the solvency of each member of the Linder Oil
> Group, Biggs and [Roger] Linder should be considered for
> purposes of the revocatory action.[63]

Crescent argues that because it, Crescent, views the amorphously defined "Linder group" as an integrated or single business enterprise, the insolvency determination should be based on the collective solvency of the group rather than the solvency of only the Debtor (presumably on the assumption that with enough potentially solvent entities considered in addition to the Debtor a finding of insolvency will be impossible).

At the outset, the Court finds that how Crescent views the Linder entities for purposes of determining insolvency is irrelevant. That question is governed by the straightforward wording of La. Civ. Code art. 2036, which allows an "obligee" to revoke an "act" of its "obligor" that causes or increases the "obligor's" insolvency. Thus, the important viewpoint in the revocatory action is that of the obligee. It allows the obligee to focus on the actions of its obligor, the party liable for the debt owed the obligee, and how those actions may impact the *obligor's* solvency. This is how it should be, as the obligee can only look to its own obligor for payment and for this reason, only the solvency of that obligor matters in determining whether an act may be revoked.

Here, the obligees are the Triggering Creditors on whose behalf the Trustee is authorized to bring this action under § 544(b) of the Code. The obligor is the Debtor, LOCAP, which is the only entity contractually bound to pay the Triggering Creditors. There is no evidence, much less an assertion, that Consolidated, Destin, Reserves, or any of the other Linder entities are contractually or legally responsible to pay the Triggering Creditors' debt. Thus, since the Debtor is the only obligor, and only its assets can be considered to satisfy the Triggering Debtor's claims, it follows that only the Debtor's assets and liabilities should be considered in determining insolvency.

---

[63] *Id.* at p. 21 (italic emphasis in original; bolded emphasis added by the Court).

Crescent's assertion otherwise simply flies in the face of the clear and unambiguous wording of La. Civ. Code art. 2036.

Crescent, however, does not base its group insolvency argument on Article 2036. Instead, it relies on two cases: *First Guar. Bank v. Carter*, 563 So. 2d 1240 (La. Ct. App. 1990) and *3 Eagles Aviation, Inc. v. Rousseau*, 2005 WL 32787 (E.D. La. Jan. 5, 2005). As the following discussion of these cases shows, Crescent's reliance is misplaced as *First Guaranty Bank* does not address insolvency at all, and *3 Eagles Aviation* only considers the insolvency of the single obligor on the debt at issue.

In *First Guaranty Bank* the court was faced with an objection of improper cumulation of actions. The facts show that the plaintiff bank made a loan to Carter Mobile Homes, Inc. The owners of that company, referred to as the "Carter Brothers," executed continuing guarantees in favor of the bank, guaranteeing repayment of the Carter Mobile Homes' debt. After Carter Mobile Homes filed bankruptcy, the bank filed suit against the Carter Brothers to enforce the continuing guarantees. After the bank sued, the Carter Brothers proceeded to encumber and transfer their individual properties to third parties. Thereafter, the bank filed an amended and supplemental petition which added these third parties to the suit, and alleged that these actions were done at a time when the Carter Brothers were insolvent or that they were made insolvent by these transfers, and that they could be set aside in a revocatory action.[64] The question was whether the bank could combine its suit against the brothers to enforce the continuing guarantees with its suit against the brothers and the third-party transferees under the Louisiana revocatory action, and the Court concluded that it could.

Despite there being no discussion in the case regarding insolvency or how insolvency was to be determined, Crescent claims *First Guaranty Bank* is relevant because the court "allowed an obligee to proceed against the guarantor without naming the principal obligor."[65] It is unclear why this conclusion is pertinent to Crescent's group insolvency question, as obligees are generally always free to proceed

---

[64] *First Guar. Bank*, 563 So. 2d at 1241-1242.
[65] *Id*. at pp. 19-20.

against a guarantor when the principal obligor defaults or goes into bankruptcy. Under the terms of the guaranty agreement, the guarantor is the obligor to the bank, the obligee. Simply put, the Court does not find any support for Crescent's group insolvency argument in *First Guaranty Bank*.

Crescent also relies on *3 Eagles Aviation*, which Crescent claims "held that an obligee can maintain a revocatory action against the principal obligor and the guarantor. This means that the Eastern District of Louisiana necessarily considered the solvency of both the principal obligor and the guarantor."[66] A review of the facts of *3 Eagles* shows this assertion by Crescent is simply wrong.

In *3 Eagles Aviation*, the plaintiff, 3 Eagles Aviation, sued Wayne Rousseau, who had executed personal guaranties in favor of the plaintiff on a 1997 personal note owed to the plaintiff by Rollins Air. Rollins Air soon defaulted on the note, triggering the guarantee and making Mr. Rousseau personally liable to the plaintiff. The plaintiff eventually sued Mr. Rousseau under the Louisiana revocatory action because he had made certain transfers in 2002 that the plaintiff claimed caused or increased his insolvency. The Court found that the revocatory action could proceed:

> The Court finds that 3 Eagles has proved that it should prevail on the present revocatory action. First, Mr. Rousseau owed 3 Eagles an antecedent debt at the time of the transfers. This is because Rousseau guaranteed the note on September 24, 1997 and December 18, 1997, and Rollins Air fell into arrears in its payments around February of 1999. Rollins Air remained in default on the note. 3 Eagles sent Rousseau demand letters as guarantor of the note during the summer of 2001, and this Court enforced Mr. Rousseau's guaranty of the note by judgment on October 15, 2002. Notably, the transfers at issue took place between July 29, 2002 and October 31, 2002. Therefore, 3 Eagles' right arose long before the transfers took place. Accordingly, the Court finds that Mr. Rousseau effected the transactions after 3 Eagles' right under the note arose, as required by article 2036. The defendants have introduced no evidence to the contrary.[67]

---

[66] *Id.* at p. 20.
[67] *3 Eagles Aviation, Inc. v. Rousseau*, 2005 WL 32787 *2 (E.D. La. Jan. 5, 2005).

22

Again, nothing in *3 Eagles Aviation* can be construed to support Crescent's "group insolvency" argument. Mr. Rousseau's guarantee in that case, once triggered by Rollins Air's default under the note, *was* the antecedent debt at issue, the transfers were made by Mr. Rousseau alone around the time that he was cast in judgment on the guaranty agreement, and the revocatory action was against him alone for his conduct. The bottom line is that the case says nothing about looking to the solvency of Rollins Air and Mr. Rousseau together, and thus provides no support to Crescent's group insolvency argument.

In its Supplemental Brief, filed after the initial hearing on this matter, Crescent cites two cases from the late 19th century that purportedly support its position that a creditor must sue all solidary obligors on a debt, and thus look to the solvency of all the obligors when asserting a revocatory action: *Dreyfous v. Childs,* 48 La. Ann. 872 (1896); and *Hart v. Bowie*, 34 La. Ann. 323 (1882). The Court has examined both cases, and indeed, the court in each dismissed the action because the plaintiff had failed to allege in his petition that the transfers at issue had caused the insolvency of all of the obligors.

The key fact in these old cases is that multiple obligors were liable to the plaintiff for the debt at issue. That is not the case here. As shown above, only the Debtor was liable for the debts of the Triggering Creditors. Thus, the 19th century cases cited by Crescent are distinguishable and the Court declines to follow them.

In summary, Crescent has failed to present any support for its "group insolvency" theory, and the Court can find no case law that has even considered the theory. Perhaps most importantly, Crescent's argument finds no support in the governing Louisiana statute, La. Civ. Code art. 2036. The Court therefore rejects Crescent's "group insolvency" theory.[68]

---

[68] The Court's decision on this issue is based on Crescent's argument that the insolvency determination should be based on the solvency of the entire Linder Group, which Crescent defines to include the Debtor, the Debtor's general partners, Linder Energy and Louisiana General, plus Consolidated, Destin, Reserves, Roger Linder, and Biggs. The Court notes, however, that the solvency of the Debtor's general partners, Linder Energy and Louisiana General, may be relevant in determining the insolvency of the Debtor at the time of the transfers based on the definition of

### 4. Prescription on the Revocatory Action

Louisiana Civ. Code art. 2041 defines the prescriptive period for revocatory actions. As originally enacted in 1984 it provided:

> The action of the obligee must be brought within one year from the time he learned or should have learned of the act, or the result of the failure to act, of the obligor that the obligee seeks to annul, but never after three years from the date of that act or result.[69]

This provision provides a one year prescriptive period running from the time the obligee knew or should have known of the "act" by the obligee, subject to an absolute bar against the action after three years from the date of the "act." In the bankruptcy context, it generally limits a trustee's avoidance powers to transfers (acts) occurring up to three years prior to the debtor's bankruptcy filing.

Article 2041 was amended effective August 1, 2013 (the "2013 amendment"). This amendment maintains the original wording of the Article and adds the following sentence:

> The three year period provided in this Article shall not apply in cases of fraud.[70]

This sentence eliminates the three year bar "in cases of fraud," but otherwise the three year bar still applies. The 2013 amendment was short-lived as a legislative amendment in 2021 deleted the above sentence, thus returning Article 2041 to its original 1984 form. Although Louisiana law generally allows retroactive application of amendments to prescriptive statutes, retroactive application cannot operate to divest a party of vested rights.[71] Thus, although now repealed, the 2013 amendment applies here.

---

"insolvency" for partnership debtors in the Bankruptcy Code. *See* 11 U.S.C. § 101(32)(B); *see also* COLLIER ON BANKRUPTCY, *supra*, ¶ 546.06[3]; *In re WRT Energy Corp.*, 282 B.R. 343, 410-411 (Bankr. W.D. La. 2001) (same balance sheet test of insolvency used in proceeding under constructive fraud provision of bankruptcy fraudulent transfer statute also applies in revocatory action under Louisiana law).

[69] La. Civ. Code art. 2041 (1984).
[70] La. Civ. Code art. 2041 (2013).
[71] *See* the section of this Opinion entitled "Retroactive Application of the 2013 amendment," *infra*,

Application of the 2013 amendment to the facts of this case is significant because, as the Non-Bank Defendants point out, it has the potential to triple the Trustee's potential recovery if she can show this case fits the parameters of "in cases of fraud."[72] Thus, prescription is the most hotly contested issue in this case, including in the parties' motions for partial summary judgment.

Most of the parties' arguments have centered on the meaning and parameters of the term "fraud," which was not defined in the amendment. Thus, the Court will first consider and determine that issue, followed by an examination of the summary judgment record to determine whether the Trustee at least survives the Defendants' motions for partial summary judgment on the issue of fraud as it applies to extending the prescriptive period on the revocatory action. Finally, the Court will revisit its prior decision on the retroactive application of the 2013 amendment to address issues raised during the hearing on the parties' motions.

### (a) The Meaning of the Phrase "In Cases of Fraud"

There is little agreement between the parties on the meaning of the term fraud in the 2013 amendment, or its parameters. On the one hand, there is the position of the Trustee, who has set forth three different definitions of the term. She initially claimed it should be defined by the definition contained in La. Civ. Code art. 1953.[73] However, weeks later, in her opposition to the defendants' motions, she completely abandoned that position and argued instead that "'fraud' in Article 2041 should be interpreted by referencing Article 2036's source articles, which focus on prejudice (*fraus*), rather than deliberate deceit (*dolus*)."[74] Finally, in her supplemental brief,

---

for a discussion of the concept of vested rights and the effect of changes in prescriptive statutes on those rights.

[72] *See* Non-Bank Defendant's Opposition to the Trustee's Motion for Summary Judgment, pp. 9-10 (ECF #434). According to the Non-Bank Defendants, if the Trustee is limited to the three year look-back period for recovery of the Consolidated Transfers, her potential recovery would be just shy of $1,000,000. But if she is able to expand the prescriptive period, her potential recovery will balloon to just under $3,000,000. The expanded prescriptive period would have a similar impact on the claims involving the Partner Distributions.

[73] Plaintiff's Memorandum in Support of Motion for Summary Judgment, pp. 18-19 (ECF #409)

[74] Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, p. 4 (ECF

filed after the oral arguments on the motions, she again changes position on the definition, contending now that fraud means "fraudulent conveyance" because the Louisiana revocatory action, which is based on the Paulian action under Roman civil law, is "strikingly similar" to the common law fraudulent conveyance action.[75] The Trustee claims that under this standard she is only required to prove a "general intent to hinder, delay, or defraud future creditors; proof of the target's identity is not required."[76]

On the other hand, the defendants contend (more accurately, assume) that the term fraud in the 2013 amendment should be defined by reference to the definition of fraud in La. Civ. Code art. 1953. They claim this definition requires the Trustee to show a misrepresentation or suppression of the truth aimed at the Triggering Creditors, which they claim the Trustee has not and cannot show. Additionally, they argue fraud cannot be shown by silence because the Debtor was under no duty to speak or disclose the Debtor's financial condition to the Triggering Creditors.

The Court is now tasked with making an *Erie* guess as to how the Louisiana Supreme Court would define the term fraud under these circumstances.[77] The Court has carefully considered the parties' arguments and other sources and, for the

---

#454). *See also Murray v. Stacy Trust (In re Goldberg)*, 277 B.R. 251 (Bankr. M.D. La. 2002), a case in which the court engaged in an exhaustive review of the history of the revocatory action, tracing it back to *Actio Pauliana* in Roman law. As part of that analysis, the court discussed the differences between the Latin terms *fraus* and *dolus*: "'The point is that the term *fraus*, in Latin, does not really mean 'fraud' at all in the sense of 'deceit'—at any rate, not deliberate fraud. The word for that is *dolus*. The word *fraus* means 'prejudice' or 'disadvantage.'" *Id.* at 273, *quoting* Radin, "Fraudulent Conveyances at Roman Law," 18 Va. L. Rev. 109, 110-111 (1931). Thus, in her reply brief, the Trustee essentially argued that she only needed to show a disadvantage to creditors in order to extend the prescriptive period beyond three years. Although the Trustee ultimately abandoned this argument, the Court nonetheless rejects it as it would render the three year bar in Article 2041 meaningless. *See Credit v. Richland Par. Sch. Bd.*, 85 So. 3d 669, 678 (La. 2012), citing *ABL Mgmt., Inc., v. Board of Supervisors of Southern Univ.*, 773 So. 2d 131, 135 (La. 2000) ("[I]t is a cardinal rule of statutory interpretation that 'it will not be presumed that the Legislature inserted idle, meaningless or superfluous language in the statute or that it intended for any part or provision of the statute to be meaningless, redundant or useless.'").

[74] Plaintiff's Reply to Defendant's Oppositions to Motion for Partial Summary Judgment, pp. 3-8 (ECF #469).

[75] *Id.*; *see also* La. Civ. Code Ann. art. 2036, Official Comments—1984, Comment (c) ("The revocatory action, an institution derived from Roman law, is the civil law analogue to the common law suit to set aside a fraudulent conveyance.").

[76] *Id.*, citing COLLIER ON BANKRUPTCY, ¶ 548.04[1].

[77] *See Erie R.R. v. Tomkins*, 304 U.S. 64; 58 S. Ct. 817 (1938).

following reasons, concludes that the Louisiana Supreme Court would define "fraud" in the 2013 amendment as described in La. Civ. Code art. 1953.

First, the Louisiana Supreme Court, in *Ogea v. Merritt*,[78] showed no hesitation in looking to Article 1953 to define "fraud" as used in La. R.S. 12:1320(D), which did not include a definition of fraud. That statute provides a "fraud exception" to the general rule of limited liability afforded members of limited liability companies. The Court stated:

> With our interpretive inquiry framed by a general rule of limited liability, a rule which is made subject to exceptions, we turn to the first exception to limited liability at issue in this case, *i.e.,* fraud. As noted, fraud is not defined in La. R.S. 12:1320(D); therefore, we must turn elsewhere for a definition. Louisiana's most longstanding legislative compilation, the Civil Code, provides the following definition: "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. C.C. art.1953. This definition of fraud has remained essentially unchanged from that contained in Article 1847(6) of the Civil Code of 1870. *See* La. C.C. art.1953, Revision Comment–1984, comment (a). It is appropriate to draw from such a longstanding definition because, when the legislature enumerated the term "fraud" but did not define "fraud" in La. R.S. 12:1320, "this Court must assume the Legislature was aware of existing laws on the same subject." *See Foti v. Holliday,* 09–0093, p. 6 (La.10/30/09), 27 So. 3d 813, 817.[79]

The reasoning in *Ogea* is sound, and the Court will follow it. The definition of fraud in Article 1953 has remained virtually the same since it appeared in Article 1847(6) of the Civil Code of 1870, and the Legislature is presumed to have been aware

---

[78] 139 So. 3d 888 (La. 2013).

[79] *Id.* at 897-898; *see also Fontenot v. Reddell Vidrine Water Dist.*, 836 So. 14, 24 (La. 2003); *Najor v. Plaquemines Clay Co., LLC*, 2019 WL 1597872, *5 (E.D. La. Apr. 15, 2019) (without any analysis in a Rule 12(b)(6) motion, the court defined "fraud" in Article 2041 by reference to La. Civ. Code art. 1953, for purposes of determining whether the plaintiff had stated a claim for fraud).

of this law when it enacted the 2013 amendment.[80] The court's reasoning also highlights the need for consistency in the meaning of terms in the law, particularly in circumstances in which the Legislature has not provided a contrary or inconsistent meaning. Thus, it seems likely the Louisiana Supreme Court would define "fraud" in the 2013 amendment to Article 2041 by reference to Article 1953, consistent with its approach in *Ogea*.

Second, the 2013 amendment is not the first time the Louisiana Legislature has established a fraud exception to the running of a three year bar to a claim. It has occurred at least two other times: La. R.S. 9:5605 (defining the prescriptive period on legal malpractice actions) and La. R.S. 9:5606 (defining the prescriptive period on insurance agent liability). Like La. Civ. Code art. 2041, both of these statutes provide: (i) a one year prescriptive period from the date the plaintiff discovers or should have discovered the act; (ii) a three year bar to the filing of such claims running "from the date of the alleged act, omission, or neglect";[81] and (iii) a fraud exception to the three year period ("The preemptive period provided in Subsection A of this Section shall not apply *in cases of fraud*, as described in Civil Code Article 1953."[82]).

Simply put, the prescriptive and peremptive periods in the malpractice statutes above are virtually identical to the prescriptive period on revocatory actions as set forth in La. Civ. Code art. 2041 as amended in 2013. The only difference is that the Legislature did not include the clause "as described in Civil Code Article 1953" after the phrase "in cases of fraud" in the 2013 amendment. Louisiana law provides: "Laws on the same subject matter must be interpreted in reference to each other."[83] Applying this directive here, the Court finds that the Legislature's reference to Article 1953 for the definition of fraud for purposes of determining the fraud exception to the peremptive period running on these malpractice actions likely means that the term

---

[80] *See Eicher v. La. State Police, Riverboat Gaming Enf'd Div.*, 710 So. 2d 799, 805 (La. Ct. App. 1998) (the Legislature is presumed to have enacted the statute with deliberation and with full knowledge of all existing laws on the same subject, and with the intention of achieving "a consistent body of law." (citations omitted)).

[81] La. R.S. 9:5605(A); La. R.S. 9:5606(A).

[82] La. R.S. 9:5605(E); La. R.S. 9:5606(C) (emphasis added).

[83] La. Civ. Code art. 13.

28

"fraud" in the 2013 amendment to Article 2041 should similarly be defined "as described in Civil Code Article 1953." This is especially so here because there is no direct or implicit indication that the Legislature intended a different definition to be used.

Accordingly, it is this Court's *Erie* guess that the Louisiana Supreme Court would likely define fraud in the 2013 amendment to Article 2041 by reference to La. Civ. Code art. 1953, which provides:

> Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.[84]

The Court now turns to the questions of the parameters of the fraud, such as whether the fraud must relate to the actual "acts" that give rise to the revocatory action and whether there must be a nexus between the fraud and the Triggering Creditors. There are no Louisiana cases that have considered the 2013 amendment, but there are Louisiana cases interpreting the "in cases of fraud" provision in the legal malpractice statute, La. R.S. 9:5605(E), including the Louisiana Supreme Court case of *Lomont v. Bennett*.[85] Because the wording of La. R.S. 9:5605(E) is virtually identical to the wording of the 2013 amendment, this case is particularly instructive.

The issue in *Lomont* was whether the fraud exception in La. R.S. 9:5605(E) was only applicable in cases where the fraudulent act itself constituted the malpractice, or whether the concealment of the malpractice could also constitute fraud. Prior to the Supreme Court's decision, lower Louisiana courts had generally refused to find post-malpractice concealment by the attorney to equate to fraud, finding instead that the act of malpractice itself had to be fraudulent.[86]

---

[84] La. Civ. Code art. 1953.

[85] 172 So. 3d 620 (La. 2015).

[86] *See Lomont v. Myer-Bennett*, 164 So. 3d 843 (La. Ct. App. Cir. 2014), 164 So. 3d 843, *rev'd sub nom, Lomont v. Bennett*, 172 So. 3d 620 (La. 2015); *Carriere v. Bodenheimer, Jones, Szwak & Winchell, L.L.P.*, 120 So. 3d 281 (La. Ct. App. 2012); *Broadscape.com, Inc. v. Matthews*, 980 So. 2d 140 (La. Ct. App. 2008); *Brumfield v. McElwee*, 976 So. 2d 234 (La. Ct. App. 2008); *Smith v. Slattery*, 877 So. 2d

29

*Lomont* overruled the lower courts and concluded that post-malpractice actions may trigger the fraud exception, depending on the facts of each case. In reaching its conclusion, the court employed an expansive view of "fraud" for purposes of determining whether the exception to peremption applied:

> The language of La. R.S. 9:5605(E) excepts the peremptive period "in cases of fraud, as defined by La. C.C. art.1953," with no additional restrictions or limitations. La. C.C. art 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." Thus, under the clear wording of the statute and the Code article, any action consisting of "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other" will prohibit application of the peremptive period. Concealment of malpractice to avoid a malpractice claim conforms to this definition. It would be absurd to interpret the statute to exclude fraudulent concealment of the malpractice. There is no support for an interpretation that would allow attorneys to engage in concealment of malpractice until the three-year peremptive period has expired. As this court noted in *Borel v. Young,* albeit in dictum, "[p]resumably, by exempting claims of fraud, the legislature intended to restore the third category of contra non valentem **so as to prevent a potential defendant from benefitting from the effects of peremption by intentionally concealing his or her wrongdoing.**" 07–0419 (La.11/27/07), 989 So. 2d 42, *on reh'g,* (7/1/08), 989 So. 2d at 61 n. 3 (emphasis added). The basic rule governing statutory interpretation is stated in Louisiana Civil Code article 9: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." Applying the clear and unambiguous language of the statute, we hold allegations of misrepresentation,

244 (La. Ct. App. 2004), *writ denied*, 885 So. 2d 592 (La. 2004); *Atkinson v. LeBlanc,* 860 So. 2d 60 (La. Ct. App. 2003).

30

suppression or concealment of malpractice can constitute fraud within the meaning of La. R.S. 9:5605(E).[87]

There are a few key takeaways from *Lomont* that are relevant here. First, the court makes it clear that ***any action*** consisting of a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other will prohibit application of the peremptive period. And the court also makes it abundantly clear that the fraud does not need to be tethered to the act itself. Thus, it is this Court's *Erie* guess that the Louisiana Supreme Court would establish similar parameters on the application of the fraud exception set forth in the 2013 amendment.

Second, inherent in the Louisiana Supreme Court's decision is that the fraud must be directed to the party making the claim. This follows from the court's quoting from Article 1953 when it states the misrepresentation or suppression of the truth must be aimed at providing an unjust advantage *to one party* or a loss or inconvenience *to the other* party. Thus, this would require proof of the identity of the target of the fraud.

Finally, *Lomont* provides further insight into the likely intent behind fraud exceptions to prescriptive periods. The court stated: "'[p]resumably, by exempting claims of fraud, the legislature intended to restore the third category of contra non valentem **so as to prevent a potential defendant from benefitting from the effects of peremption by intentionally concealing his or her wrongdoing.'"**[88] Contra non valentem is a jurisprudential doctrine establishing criteria that will prevent the running of prescription on claims. The third category of that doctrine provides: "(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action."[89]

It is tempting to conclude here that the legislative intent behind the fraud exception in the 2013 amendment was to target obligors who have taken actions to

---

[87] *Lomont v. Bennett*, 172 So. 3d 620, 628-29 (La. 2015), (emphasis in original).
[88] *Id.*, quoting *Borel v. Young*, 989 So. 2d 42 (La. 2007), *on reh'g*, 989 So. 2d at 61 n. 3 (2008) (emphasis in *Lomont*).
[89] *In re Queyrouze*, 580 B.R. 671, 681 f. 20 (E.D. La. 2017).

31

prevent the obligee from availing himself of pursuing the revocatory action, particularly since the fraud exception is in the article establishing the prescriptive period on revocatory actions *and not* an underlying element of the revocatory action itself.[90] The Court is reluctant to make this conclusion its *Erie* guess, however, primarily because the Louisiana Supreme Court states that it is only making a presumption regarding the legislative intent behind the exception, and because in the same paragraph the court states that ***any action*** consisting of a misrepresentation or suppression of the truth may trigger the exception.

Thus, it is this Court's *Erie* guess that the Louisiana Supreme Court would define the parameters of the fraud exception in the 2013 amendment just like it did in *Lomont*:

> Thus, under the clear wording of the statute and the Code article, **<u>any action</u>** consisting of "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other" **<u>will prohibit application of the peremptive period</u>**.[91]

In reaching this conclusion, the Court rejects the Trustee's latest argument that the Legislature, by sticking the word fraud in the prescriptive statute on revocatory actions, intended to import into Louisiana law the entire body of fraudulent conveyance law emanating from § 548(a)(2)(A) of the Bankruptcy Code and the common law Uniform Fraudulent Conveyance Act.

---

[90] There is support for this conclusion when Official Comment (a) to La. Civ. Code art. 2041 is considered. This Comment shows that the potential for a "devious obligor" to conceal his actions was actively considered when the original prescriptive statute was enacted. This is why Article 2041 provides that the one year prescriptive period does not begin to run until the obligee knew or should have known of his obligor's act of transferring property. But the Louisiana Legislature determined that the security of transactions, particularly title to immovable property, takes priority at the three year mark from the date of the act, thus the reason for the three year bar. Given the concern that a "devious obligor" may conceal his actions until after the running of the prescriptive period, it is reasonable to conclude that the Legislature, by inserting the fraud exception to the three year bar on revocatory actions, intended to prevent an obligor from benefitting from the effects of that bar by intentionally concealing his acts.

[91] *Lomont*, 172 So. 3d at 628-629 ("any action" emphasized in original; other emphasis added).

In summary, the Court makes the following conclusions—*Erie* guesses—on the meaning and parameters of fraud as set forth in the 2013 amendment to La. Civ. Code art. 2041:

1. The term fraud in the 2013 amendment to Article 2041 shall be defined by reference to the definition of fraud in La. Civ. Code art. 1953, and the elements necessary for the Trustee to prove fraud under that Article are: "'(1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resulting injury;'"[92]

2. ***Any action*** consisting of a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other will prohibit application of the three year bar to the revocatory action; and

3. There must be a nexus between the fraud and the Triggering Creditors.

### (b) Evidence of Potential Fraud in the Summary Judgment Record

The Court now turns to whether the summary judgment record contains any evidence of fraud aimed at the Triggering Creditors that may make the fraud exception in the 2013 amendment applicable in this case. The Defendants point to the Trustee's testimony that she is not aware of any fraud. The Defendants also assert that the Trustee has not presented any evidence of fraud. However, as the Trustee points out, there is evidence of a representative of the Debtor contacting at least one of the Triggering Creditors by email and leading them to believe the Debtor had no excess cash to pay their invoices:

> This company [the Debtor] acknowledges the amount owed to OSFI, and intends to pay the entire amount as soon as possible. The problem is that the company is under considerable pressure from BSEE to complete a series of projects in the OCS . . . The best guess estimate is that the

---

[92] *D.H. Griffin Wrecking Co., Inc. v. 1031 Canal Dev., LLC*, 463 F. Supp. 3d 713, 725–26 (E.D. La. 2020), *quoting Sys. Eng'g & Sec., Inc. v. Sci. & Eng'g Associations, Inc.*, 962 So. 2d 1089, 1091 (La. Ct. App. 2007).

current condition of the company will continue for at least the next 12 months. ***During that period I will make every effort to send any, excess cash if any, the company may develop to OSFI*** as an installment payment. . . . the company is committed to sending as much as possible as often as possible. . . .[93]

If the Debtor, by making these statements, intended to prevent one of the Triggering Creditors from pursuing collection efforts while at the same time the Debtor was transferring cash (i.e., excess cash) to a company to which it owed no money (Consolidated), then the fraud exception may be triggered. The Court is unable to grant summary judgment to the Trustee on this issue, however, because it is not clear in the record as to which "12 months" the Debtor was referring when it stated it may not have "excess cash" available. Moreover, the summary judgment record contains evidence that the Debtor may have been using property owned by Consolidated for its offices, which may support the payments being made to Consolidated. The record also contains evidence that the arrangement between the Debtor, Crescent, and First NBC regarding payments by the Debtor to Consolidated had been in place many years before any amounts were owing to the Triggering Creditors, which may militate against a finding of specific intent by the Non-Bank Defendants to gain an advantage over the Triggering Creditors. Since the Court is unable to weigh the evidence at the summary judgment stage, both the Trustee's and the Defendants' motions for partial summary judgment on this issue must be denied.

### (c) Retroactive Application of the 2013 Amendment

Before leaving the issue of prescription on the revocatory action, the Court will address the issue of retroactive application of the 2013 amendment. In connection with an earlier motion in this case, the Court examined Louisiana law on the retroactivity of statutes to determine whether the 2013 amendment may be applied retroactively (the standard for procedural changes) or prospective only (the standard

---

[93] Plaintiffs' Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment, p. 7 (ECF #454) (emphasis added).

for substantive changes).[94] After a careful analysis of Louisiana law, the Court concluded that the amendment was procedural in nature because its application only impacted the determination of the applicable prescriptive period; it did not change any of the substantive elements of the revocatory action contained in La. Civ. Code art. 2036 or create a new right or cause of action.[95] Thus, the Court concluded the amendment could be applied retroactively.

In reaching that conclusion, however, the Court also found that retroactive application could not operate to divest the defendants of vested rights. Thus, given the effective date of the amendment, August 1, 2013, the Court ruled that the defendants had a vested right in asserting that any claim arising more than three years before August 1, 2013, which is August 1, 2010, was perempted under the existing three year peremption rule in Article 2041:

> Here, the question is whether the 2013 amendment adding the exception for fraud would divest Crescent of the right to plead peremption on any of the claims against it. That would only be true as to a claim that had already been perempted as of the effective date of the amendment, August 1, 2013. Given the three year peremptive period, that would mean any claim for transactions occurring prior to August 1, 2010. Any claim for transactions occurring after August 1, 2010 would have still been alive on August 1, 201[3] and thus would be subject to the new fraud exception.[96]

---

[94] *See* La. Civ. Code art. 6 ("In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is legislative expression to the contrary."). "A substantive law is one that creates an obligation; its acts are generally defined as those which create, confer, define, or destroy rights, liabilities, causes of action or legal duties." *National Equity Life Ins. Co. v. Eicher*, 633 So. 2d 1351, 1354-1355 (La. App. 1st Cir. 1994). "Procedural acts describe methods for enforcing, processing, administering, or determining rights, liabilities, or status." *Id. See also Ebinger v. Venus Const. Corp.*, 65 So. 3d 1279, 1285 (La. 2011); *Chance v. Am. Honda Motor Co.*, 635 So. 2d 177, 178 (La. 1994) (both cases holding that changes to prescription statutes cannot operate retroactively to divest a party of rights that have already vested). *See also, Matter of O'Connor*, 153 F.3d 258, 262 (5th Cir. 1998) ("While this article [a Louisiana Civil Code article defining when the interruption of prescription against a surety becomes effective against the principal obligor] was not in effect when the option contract was made, it is retroactive because the statute addresses prescription so it is procedural."), *citing Chance*, 635 So. 2d at 178.

[95] *See* October 27, 2021 Memorandum Opinion, pp. 17-21 (ECF #206).

[96] *Id*. at p. 20.

35

During the hearing on the present matters before the Court, counsel for the parties and the Court again engaged in a discourse as to whether the amendment to Article 2041 was substantive rather than procedural in nature. Although the parties did not formally ask the Court to reconsider its ruling on this matter, the Court stated during the hearing that it would take a second look at this question.[97]

On second look, the Court will abide by its original determination on the issue for several reasons. First, the Louisiana Supreme Court's analysis of the fraud exception to the three year peremptive period on attorney malpractice actions in *Lomont* shows that the determination of whether the exception is triggered is a procedural question. The issue there was raised in a peremptory exception of prescription, which is a Louisiana procedural tool for determining issues such as prescription in advance of trial on the merits of the underlying claim. The court reviewed the evidentiary record, concluded the fraud exception had been triggered, and then remanded the case to the trial court for further proceedings on the underlying claim.

Following the remand, in a subsequent appeal of the case, the court discussed the difference between the procedure to establish fraud for purposes of determining whether the exception to peremption had been triggered and the trial on the merits of the underlying malpractice claim:

> We note that Ms. Lomont, in her pleadings to the district court and this Court, has also taken an expansive position regarding the scope of the ruling of the Louisiana Supreme Court in the first appeal of this matter, arguing that its ruling has resolved the issue of Ms. Myer-Bennett's liability for legal malpractice, and that the only issue left to be tried is the amount of Ms. Lomont's damages. We note that the only ruling issued by the Supreme Court is an

---

[97] *See* Fed. R. Bankr. P. 7054, which makes Fed. R. Civ. P. 54(b) applicable to bankruptcy cases. Rule 54(b) authorizes a court to modify an interlocutory order. *See United States v. Renda*, 709 F.3d 472, 479 (5th Cir. 2013) ("Rule 54(b) authorizes a district court to reconsider and reverse its prior rulings on any interlocutory order for any reason it deems sufficient.") (internal quotation marks and citation omitted). The Court may exercise this authority *sua sponte. See McKethan v. Texas Farm Bureau*, 996 F.2d 734, 736 n. 6 (5th Cir. 1993) (approving district court's *sua sponte* reversal of a denial of partial summary judgment); *Stephens v. Fla. Marine Transporters, Inc.*, No. 12-1873, 2013 WL 5236624, at *1, n. 1 (E.D. La. Sept. 16, 2013) (*sua sponte* reconsidering a ruling on a motion *in limine*).

interlocutory ruling on an exception of peremption, wherein the Court made a factual determination, based upon the evidence in the record before it at that time, regarding Ms. Myer-Bennett's fraudulent concealment of an act that is alleged to be legal malpractice. Ms. Lomont appears to erroneously fail to make a distinction between fraud in the post-malpractice concealment of an act that is alleged to constitute legal malpractice, and the act of alleged legal malpractice itself. In the Supreme Court's *Lomont* opinion, it succinctly discussed this distinction in analyzing whether the fraud exception in La. R.S. 9:5605(E) applies to fraudulent acts of post-malpractice concealment, or only where the fraudulent act itself constitutes the malpractice. We therefore note that there has been no trial on the merits of the alleged legal malpractice, no finding of fact as to the alleged legal malpractice (as distinguished from the Supreme Court's factual finding of subsequent fraudulent concealment of an act that is alleged to be legal malpractice), and no judgment rendered on Ms. Lomont's underlying legal malpractice claim.[98]

This excerpt explains that whether a prescriptive period should be extended for fraud is a separate procedural determination from the determination of the merits of the underlying action. Thus, the Supreme Court's decision in *Lomont*, and the lower court's interpretation of that decision, indicate that the fraud determination in a prescriptive statute is a procedural inquiry, not a determination of the actual cause of action.

Second, Crescent sought leave from the district court to appeal this Court's interlocutory order, which was denied on the grounds that (i) Crescent had failed to show that this Court applied the incorrect standard for answering the question; (ii) it would have only a minor impact on discovery and related motion practice in the adversary proceeding; and (iii) the issue will be reserved and can be reviewed after a final judgment based on the entirety of the record.[99] Thus, since the issue is preserved in the event there is an appeal following a final judgment in this case, the more

---

[98] *Lomont v. Myer–Bennett*, 210 So. 3d 435, f. 3 (La. Ct. App. 2016).
[99] *See Crescent Bank & Tr. v. Cadle Co. II, Inc.*, 2022 WL 569746, at *4 (W.D. La. Feb. 24, 2022).

efficient course of action is to treat this Court's previous decision as the law of the case.

This brings the Court to its third reason for resting on its original decision: reversing that decision would not avoid a determination of the fraud exception. Even if the amendment to Article 2041 were limited to prospective application only, it would still apply from the August 1, 2013 effective date forward and therefore include some periods beyond the standard three year look-back period from the petition date if it is shown that this is a case of fraud. Thus, the trial court would still have to determine whether at least some of the transfers trigger the exception to the three year prescriptive period "in cases of fraud."

## B. Count 2: Actual Fraud under § 548

The Trustee has asserted a claim for actual fraud under 11 U.S.C. § 548(a)(1)(A). Both the Non-Bank Defendants and Crescent have moved for partial summary judgment on the grounds that the Trustee has failed to prove the elements of actual fraud. "To prevail on a claim for fraudulent transfer under § 548(a)(1)(A), the Trustee must prove the following elements: (1) a transfer was made of the Debtor's property; (2) the transfer was made within two years of the Petition Date; and (3) the transfer was made with actual intent to hinder, delay, or defraud the Debtor's creditors."[100] The Fifth Circuit has identified various "badges of fraud" that tend to evidence a transfer made with intent to defraud under § 548:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or

---

[100] *In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 673 (Bankr. S.D. Tex. 2009), *aff'd sub nom. Hsu v. West*, No. ADV 08-03177, 2009 WL 7760300 (S.D. Tex. Dec. 30, 2009) (citing § 548(a)(1)(A); *Havis v. AIG Sunamerica Life Assurance Co. (In re Bossart)*, No. 06–3540, 2007 WL 4561300, at *8 (Bankr. S.D. Tex. Dec. 21, 2007)).

pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.[101]

Both the Non-Bank Defendants and Crescent have moved for partial summary judgment on this claim on the grounds that the Trustee has failed to prove the elements of actual fraud. The Trustee counters that the transfers (both the Consolidated Transfers and the Partner Distributions) satisfy many of the badges of fraud because they were made to the Non-Bank Defendants either directly or through entities controlled by them, and the transfers directly benefited the Non-Bank Defendants.

Based on the summary judgment record, it appears that many of the Badges of Fraud are present here and may support an inference of actual intent to defraud by the Non-Bank Defendants. However, and even though the Trustee did not move for summary judgment on the actual fraud aspect of her § 548(a)(1)(A) claim, the Court nonetheless notes that this same evidence depicts a long-standing arrangement between the Non-Bank Defendants, First NBC and Crescent, which may counter against a finding of actual fraud. Moreover, as noted above, the Non-Bank Defendants claim the Debtor was utilizing a building owned by Consolidated for its offices, which may support part of the Consolidated Transfers. The Court simply cannot weigh this evidence at the summary judgment stage.

Accordingly, the Court denies the Non-Bank Defendants and Crescent's Motions for Partial Summary Judgement on Count 2.

## C. Count 3: Constructive Fraud under § 548

The Trustee seeks summary judgment on her claim for constructive fraud under § 548(a)(1)(B). "[T]o establish a claim for avoidance of a transfer as constructively fraudulent under § 548(a)(1)(B), the [Trustee] must prove each of the following elements: (i) that the transfer was of an interest of the Debtor in property; (ii) that the Debtor made the transfers on or within two years before the petition date; (iii) that the Debtor received less than a reasonably equivalent value in exchange for

---

[101] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008) (citations omitted).

the transfers; and, inter alia, (iv) that the Debtor was insolvent on the date that the transfer was made or that the Debtor intended to incur, or believed he would incur, debts that would be beyond his ability to pay as such debts matured."[102] "Put simply, this section allows a trustee to nullify certain inflated transactions to conserve the debtor's estate for the benefit of creditors. Any significant disparity between the value received and the obligation assumed will have significantly harmed the innocent creditors of the debtor. Unlike the provisions on actual fraud, the constructive fraud provision is not concerned with the debtor's intent, but rather the value the debtor received." [103]

Under the constructive fraud theory, "[w]hether a debtor received reasonably equivalent value is a two-part inquiry: (1) whether the debtor received value, and (2) whether that value was reasonably equivalent."[104] Value, which is determined on the date of transfer, is not subject to later fluctuations in the value of assets, nor is it necessary for a debtor to receive exact equivalent value.[105] "There is no bright line rule used to determine when reasonably equivalent value is given. The important elements to consider are (1) fair market value and (2) whether there was an arm's length transaction. A determination of reasonably equivalent value is 'fundamentally one of common sense, measured against market reality,'" and courts look to the totality of the circumstances.[106] However, "[w]hen a debtor makes a payment on antecedent debt and receives a dollar-for-dollar reduction of that debt, however, the question is easy because the debtor by definition receives reasonably equivalent value—indeed, *exactly* equivalent value, assuming, of course that the debt itself was based upon value."[107]

The Trustee alleges that the Debtor did not receive "reasonably equivalent value" for its transfers to Consolidated, in that the Trustee claims the Debtor received

---

[102] *In re Triplett*, 651 B.R. 196, 202–03 (Bankr. E.D. Tex. 2023).
[103] *Matter of Louisiana Pellets, Inc.*, 838 F. App'x 45, 49 (5th Cir. 2020) (citations and internal quotation marks omitted).
[104] *Id.*
[105] *Id.*
[106] *In re Lindell*, 334 B.R. 249, 255–56 (Bankr. D. Minn. 2005) (citations omitted).
[107] *Louisiana Pellets*, 838 F. App'x at 50 (citations omitted, emphasis in original).

nothing of value. In their response to the Trustee's Motion for Partial Summary Judgment on the constructive fraud issue, they correctly note that "reasonably equivalent value" is a factual determination, and they point to facts tending to show that the Debtor may have received such value by paying Consolidated, including the fact that the Crescent loan to Consolidated was secured in part by a mortgage in an office where one of the Debtor's offices was located.[108]

The problem is that whether the Debtor received "reasonably equivalent value" is a factual issue. The summary judgment record contains opposing facts and competing interpretations of those facts on these claims. It is impossible to reach a finding of fact on summary judgment on constructive fraud because to do so would require making numerous judgment calls and weighing evidence, something that is not permitted under Rule 56. (The Court also notes that this would be only a partial summary judgment because the parties did not address all of the elements, such as insolvency.) Accordingly, summary judgment will be denied.

## D. Count 4: Transferee Liability under § 550

All three motions seek summary judgment on Count 4, which states: "To the extent the Transfers are avoided under any of counts three, four, or five of this Complaint, the Trustee is entitled to recover the value of the avoided transfers from Consolidated, Linder and Biggs, as initial transferees and/or beneficiaries of the avoided transfers, and Crescent, as immediate and/or mediate transferee" under 11 U.S.C. § 550.[109] Section 550 provides, in relevant part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

---

[108] *See* Non-Bank Defendants' Opposition to the Trustee's Motion, p. 4 (ECF #446).
[109] *See* Amended Complaint, ¶ 96 (ECF #74).

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee. . . .

*Id*.

The Non-Bank Defendants raise the simple argument that the Trustee is limited to the specific underlying counts listed in the Complaint, i.e., Counts 3, 4, or 5, and so cannot seek transferee liability under the unlisted counts, i.e., Count 1 (the Louisiana revocatory action relating to the Consolidated Transfers, even though Count 5, the Louisiana revocatory action relating to the Partner Distributions, is included) or Count 2 (actual fraudulent transfer under § 548).[110] The Non-Bank Defendants also point out that Count 4 references itself as the basis for transferee liability, which is nonsensical.[111] In response, the Trustee argues that this is clearly a typo, that the Non-Bank Defendants' harsh reading ignores other language throughout the Amended Complaint that makes the intent clear, and that the typo in that paragraph does not prejudice the Defendants.[112] The Court agrees that the Plaintiff's intent is clear and does not prejudice the defendants. Accordingly, the Court denies summary judgment on the Non-Bank Defendants' argument.

Crescent asserts a more substantive basis for summary judgment on Count 4. It argues that under § 550(b), the Trustee may not recover against Crescent because it took the transfers for value, in good faith, and without knowledge of the voidability

---

[110] *See* Non-Bank Defendants' Memorandum in Support of Motion for Partial Summary Judgment, p. 27 (ECF #398).

[111] *Id*.

[112] *See* Trustee's Opposition to the Non-Bank Defendants' Motion for Partial Summary Judgment, p. 2 (ECF #454).

of the transfer involved.[113] The Trustee points out that Crescent knew that Consolidated could not be the actual source of the funds it was using to repay the Crescent loan because it received financial statements not only from Consolidated (showing negative net worth and income from 2010 through 2017) but also from Roger Linder and the Debtor.[114] These factual arguments are well taken because they create substantial doubt as to whether Crescent accepted the Consolidated loan repayments in good faith and without knowledge of their voidability. Because it would be impossible for the Court to make these findings of fact without weighing the evidence and making credibility calls, summary judgment is not appropriate under the Rule 56 standard, so Crescent's Motion for Partial Summary Judgment will be denied as well.

### E. Count 7: Suit on an Open Account

Assuming, as explained above, that the Court has jurisdiction to determine Count 7, the Court finds that the claim should be dismissed. In Count 7 of the Complaint, Cadle, as the successor to the Debtor with respect to amounts owed by Consolidated to the Debtor, asserts a claim on an open account under Louisiana law, La. R.S. § 9:2781, against Consolidated. The Non-Bank Defendants argue that Louisiana's open account statute is strictly construed, and because there was no "open account" between Consolidated and the Debtor, this claim fails as a matter of law.[115]

The Non-Bank Defendants' argument is compelling, as an "open account" under Louisiana law does not simply mean the creation of any debt but instead anticipates that the account is for services or goods rendered, and they point out that Cadle's own corporate representative admitted at Cadle's 30(b)(6) deposition that the debt in question is not an open account and that the claim should have been amended to a contract claim.[116]

---

[113] *See* Crescent's Memorandum in Support of Motion for Partial Summary Judgment, pp. 21-24 (ECF #420-5).

[114] *See* Trustee's Opposition to Crescent's Motion for Partial Summary Judgment, pp. 13-16 (ECF #451).

[115] *See* Non-Bank Defendants' Memorandum in Support of Motion for Partial Summary Judgment, pp. 27-28 (ECF #398).

[116] *Id.*

In response, the Trustee cites no law showing that Count 7 actually involves an open account and indeed admits that its claim against Consolidated "is more akin to a claim for an unpaid loan or breach of contract than a claim for open account." Given those admissions, the Court recommends granting the Non-Bank Defendants' Motion in part and dismissing Count 7.

### Affirmative Defenses

Finally, the Trustee seeks to strike the defendants' affirmative defenses.[117] The Court believes these issues are best reserved for trial to the extent they have not already been address, especially because the Trustee's brief cites very little law or evidence in support of her contentions. Nevertheless, the Court will briefly address each of these defenses in the interest of completeness.

**Standing**: As the Trustee notes, the Court has previously ruled on the standing issue. As such, there is no need to address it again.[118]

**Statutes of Limitations**: The defendants raised the affirmative defense of statutes of limitations under various formulations, and the Trustee's brief devotes four paragraphs to the subject at a high level. The Court does not believe it prudent to take action on such thin briefing, especially when specific timeliness issues are better addressed on a claim-by-claim basis, as with the prescription/peremption discussion under the Louisiana revocatory action above.

**Waiver and Estoppel**: This is an inherently factual question that will need to be resolved at trial.

**Good Faith and Value**: This is an inherently factual question that will need to be resolved at trial.

---

[117] *See* Trustee's Memorandum in Support of Motion for Partial Summary Judgment, pp. 29-36 (ECF #309).

[118] *See, e.g.*, the Court's May 1, 2020 Order Granting Motion for Abstention as to Counts I and II of the Complaint, Denying Motion to Dismiss, and Denying Motion to Transfer Venue (ECF #71), which rejected the argument raised in Crescent's Motion (ECF #41) that the Trustee lacks standing to bring the Chapter 5 claims because she allegedly sold those claims to Cadle. *See also In re S. Coast Supply Co.*, 91 F.4th 376 (5th Cir. 2024) (holding that a preference claim arising under § 547 of the Bankruptcy Code is an estate asset that a trustee is free to sell, and the purchaser need not be a representative of the estate to pursue such a purchased preference claim).

**Laches and/or Failure of Discussion**: As the Trustee acknowledges, to the extent this applies, it would apply to the revocatory action, which will need to be tried.

**Failure to State a Claim**: The Trustee acknowledges that the Court has already ruled on the defendants' previously asserted motions to dismiss for failure to state a claim. This is not a live issue.

**Revocatory Action; Waiver (Failure to Identify a Predicate Creditor):** The Trustee acknowledges that the Court already addressed this issue, and indeed the Trustee has since identified three potential predicate creditors (i.e., Triggering Creditors) that could support a revocatory action. There is no need to relitigate this issue.

**Damages Caused by Another, Setoff and/or Recoupment, and Consent**: The Trustee argues that these affirmative defenses are not available under the Chapter 5 claims at issue, but the Trustee's briefing is short and conclusory. The Court will reserve these issues for trial where they can be better presented, if at all, by the parties.

**Assumption of Risk and Sale of Litigious Right:** These concern Cadle's purchase of certain notes from the FDIC. The Trustee's briefing is not extensive, and these issues are better reserved for trial, when they can be developed by the parties.

**Res Judicata and/or Collateral Estoppel:** The Court has already ruled on these issues and will not relitigate them here.[119]

Because the Court believes that each of these issues has either already been addressed or will need to be tried, summary judgment on the affirmative defenses will be denied.

## Conclusion

For the reasons set out above,

---

[119] In its Opposition to the Trustee's Motion, p. 15 (ECF #455), "Crescent admits that this issue [i.e., res judicata/collateral estoppel] has already been ruled upon through this Court's orders on Crescent's First, Second, and Third Motion to Dismiss [ECF 41, 42, 85, 87, 165 and 166]" but reserves the right to raise its arguments on appeal.

IT IS RECOMMENDED that the Non-Bank Defendants' Motion for Partial Summary Judgment (ECF #397) be GRANTED IN PART as to Count 7 (Suit on Open Account). Otherwise,

IT IS ORDERED that the Non-Bank Defendants' Motion for Partial Summary Judgment (ECF #397) be DENIED IN PART and that the Plaintiff's and Crescent's Motions for Partial Summary Judgment (ECF ##408 and 420) be DENIED.

IT IS FURTHER ORDERED that the defendants who previously moved to withdraw the reference file new motions to withdraw the reference to the bankruptcy court so that the case may proceed to a jury trial before the district court, with the requirement that the motion to withdraw the reference be filed within thirty (30) days from the date of this ruling.